1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRIDENT SEAFOODS
CORPORATION,

                Plaintiff,

    v.

COMMONWEALTH INSURANCE
COMPANY,

             Defendant.

CASE NO. C10-214 RAJ

ORDER REGARDING MOTIONS
FOR PARTIAL SUMMARY
JUDGMENT

## I.    INTRODUCTION

This matter comes before the court on defendant Commonwealth Insurance

Company's ("Commonwealth") motion for partial summary judgment (Dkt. # 89)[1] and

---

[1] Commonwealth has also filed a separate motion to strike the Declaration of Stephanie Grassia (Dkt. # 120), and plaintiff Trident Seafoods Corporation has filed an opposition and request to strike Commonwealth's motion to strike. Dkt. # 129. Commonwealth's motion to strike violates Local Civ. R. 7(g), which requires that the request to strike material be included in a responsive brief and prohibits a separate motion to strike. Local Civ. R. 7(g). The Local Civil Rules provide procedures for filing overlength briefs, and the fact that Commonwealth's reply memoranda was near the page limit is no excuse to violate the rules of court. Accordingly, the court DENIES and STRIKES Commonwealth's motion to strike (Dkt. # 120) to the extent it exceeds the page limit of its reply memoranda. Nevertheless, this court may only consider

plaintiff Trident Seafoods Corporation's ("Trident) motion for partial summary judgment (Dkt. # 138). Because the motions raise some overlapping issues, the court addresses both motions for partial summary judgment here.

Commonwealth moves for summary judgment on Trident's breach of contract claim on the following grounds: (1) the policy limits the amount of the loss to the value in the Statement of Values; (2) Trident had actual notice of the limit of liability endorsement; (3) Commonwealth is entitled to an offset for amounts already paid by Trident's primary and first layer excess insurers; and (4) Trident is estopped from claiming an amount in excess of the value listed in the Statement of Values. Trident argues that summary judgment on its breach of contract claim should be denied because (1) Commonwealth did not provide proper notice of the limit of liability endorsement; (2) Commonwealth's interpretation of the policy is unreasonable; and (3) Commonwealth's equitable estoppel argument is baseless.

Trident moves the court for (1) an order dismissing Commonwealth's second, third, fourth, sixth and seventh affirmative defenses, (2) an order establishing that Commonwealth's minimal contractual liability to Trident exceeds $567,000, and (3) an order establishing that the Errors and Omissions ("E&O) clause is not limited to errors and omissions identified and corrected before a loss has occurred.[2]

---

admissible evidence on a motion for partial summary judgment. The court addresses the admissibility of the Grassia declaration and report below.

[2] To avoid confusion, the court will refer to the Declaration of Barbara Schuknecht in support of Trident's opposition to Commonwealth's motion (Dkt. # 109) as "Schuknecht Decl." The court will refer to Ms. Schuknecht's declaration in support of Trident's motion for partial summary judgment (Dkt. # 139) as "2d Schuknecht Decl." The court will refer to Ms. Schuknecht declaration in support of Trident's reply (Dkt. # 184) as "Suppl. Schuknecht Decl." Similarly, the court will refer to the Declaration of Douglas Houser in support of Commonwealth's motion for partial judgment (Dkt. # 91) as "Houser Decl." The court will refer to Mr. Houser's declaration in support of Commonwealth's opposition to Trident's motion (Dkt. # 171) as "2d Houser Decl."

Having considered the memoranda, exhibits, oral argument, and the record herein, the court DENIES Commonwealth's motion for partial summary judgment and GRANTS in part and DENIES in part Trident's motion for partial summary judgment for the reasons stated below.[3]

## II. BACKGROUND

From 1993 to 2008, Trident secured excess insurance policies with Commonwealth. Dkt. # 109-6 at 9 (Ex. P to Schuknecht Decl.). Trident purchased insurance policies to cover over 100 different locations, including a fish processing plant in Chignik, Alaska ("Chignik Plant"), which it acquired in 2002. Trident acquired primary property insurance for $5 million with Lexington Insurance Company ("Lexington Policy") and first layer excess insurance for $5 million with United States Fire Insurance Company. Trident applied for and received a second excess layer insurance policy from Commonwealth for up to another $10 million in excess of the primary and first layer policies. For most of the fifteen year period, Commonwealth's excess policy followed the underlying blanket policies. Dkt. # 109-6 at 16, 23, 25 (Exs. Q, R, S to Schuknecht Decl.). During the course of their business relationship, when Commonwealth proposed material changes to a renewal policy, it advised Trident's broker, Wells Fargo Insurance Services Northwest, Inc. ("Wells Fargo"), in the quotes and binders by highlighting in bold or specifically identifying, noting, or warning that the policy contained material changes or additions. *See* Dkt. # 109-7 at 11, 14, 16, 18, 20,

_____

[3] The parties submitted additional authority and evidence in response to the court's minute order identifying questions for oral argument. Dkt. # 211, # 212. The court will not consider evidence submitted for the first time on the eve of oral argument where neither party has provided a reason why the evidence could not have been submitted earlier. Accordingly, the court has disregarded the declaration of Chris Rider and the Deposition of Joseph C. Misenti, to the extent the excerpts of the deposition were not previously provided in the record. The court also reminds the parties that they are required to provide pin-point record citations, including docket numbers, in all submissions to the court. *See* Local Civ. R. 10(e)(6).

21, 24 (Exs. V-Y to Schuknecht Decl.); # 109-2 at 38 (Ex. D to Schuknecht Decl., Myland Depo. at 329:11-15).  Commonwealth provided guidance to its underwriters that they needed to provide written notice of any change to renewal policies before the change is made.  Dkt. # 109-2 at 8, 42 (Ex. D to Schuknecht Decl., Myland Depo. at 57:16-22, 313:18-24, 393:22-24, 395:3-6).  The 2006 quote and binder for the renewal policy did not emphasize or highlight any changes or additions made to the policy, although it did list "Commonwealth Loss Occurrence Limit of Liability Clause Provision."  Dkt. # 109-8 at 8, 13 (Exs. BB, CC to Schuknecht Decl.) (Policy term was August 31, 2006-August 31, 2007).  The endorsement was not attached to the quote or binder, or otherwise discussed, but was attached to the policy which was delivered to Wells Fargo in June 2007.  Dkt. # 109-2 at 10-11 (Ex. D to Schuknecht Decl., Myland Depo. at 71:13-72:5).

The operative policy here is a surplus line coverage policy effective December 31, 2007 through December 31, 2008.  Dkt. # 91-3 at 71-86 (Ex. 4 to Houser Decl.).  On December 17, 2007, Commonwealth provided the quote for the renewal policy to Wells Fargo.  Dkt. # 91-5 at 35 (Ex. 13 to Houser Decl.).  On December 21, 2007, Commonwealth sent the binder to Wells Fargo.  Dkt. # 91-6 at 7 (Ex. 16 to Houser Decl.).  The 2007 quote and binder listed "Commonwealth Loss Occurrence Limit of Liability Clause Provision" ("LLOLE").[4]  Dkt. #91-5 at 38, #91-6 at 9 (Exs. 13, 16 to Houser Decl.).  The quote and binder also stated:  "FOLLOWING UNDERLYING POLICY AMENDMENTS:  • Clause 45.  Values: The first sentence is deleted. . . ."[5]  *Id.*  Neither the quote nor the binder contained a copy of the LLOLE or the language that had been deleted from Clause 45 of the Lexington Policy.  *Id.*  On January 8, 2008, Wells

---

[4] The language in the LLOLE provision in the 2007 policy differed from the limit of liability provision in the 2006 policy.  *See* Dkt. # 109-2 at 16 (Ex. D to Schuknecht Decl., Myland Depo. at 91:6-92:10).

[5] The first sentence of Clause 45 in the Lexington Policy states:  "The values declared to the Insurer are for information purposes only and shall not limit the coverages provided by the policy."  Dkt. # 91-3 at 21 (Ex. 2 to Houser Decl.).

Fargo sent a copy of the binder to Trident.  Dkt. # 91-6 at 12 (Ex. 17 to Houser Decl.).  On June 12, 2008, Commonwealth sent a copy of the policy, which included the LLOLE for the first time, to Wells Fargo.  *Id.* at 19 (Ex. 18 to Houser Decl.).  On July 18, 2008, a Friday, Wells Fargo sent the policy to Trident.  *Id.* at 21 (Ex. 19 to Houser Decl.).  On July 21, 2008, a Monday, a fire destroyed one of the ten buildings at the Chignik Plant.

After the fire, Trident notified the three insurers of the fire and provided documentation suggesting that the total loss exceeded $20 million.  Trident's primary insurer and first excess insurer paid $5 million each, and Trident sought the remaining loss from Commonwealth.  Trident had previously provided a "Statement of Values" ("SOV") to Commonwealth listing the value of the property as $10,567,000.  Dkt. # 109-3 at 6, 8 (Exs. G, H to Schuknecht Decl.).  In the fall of 2008, Trident informed Commonwealth that it had made an unintentional error in the way it calculated the SOV, in that the SOV did not represent replacement costs.  Dkt. # 184-2 at 18 (Ex. Z to Supp. Schuknecht Decl., Misenti Depo. at 35:4-10).

Trident eventually filed suit, and on February 4, 2010, the case was removed to this court.  On September 29, 2010, the court ordered that this lawsuit be stayed pending an appraisal hearing.  Dkt. # 42.  The appraisal panel found a total actual cash value ("ACV") loss of $17,685,000 for building and equipment, with a total replacement cost value ("RCV") loss of $23,084,000, plus $3,054,875.43 for stock, debris removal, and supplies.  Dkt. # 91-5 at 25-26 (Ex. 10 to Houser Decl.); Dkt. # 139-4 at 17-18 (Ex. O to 2d Schuknecht Decl.).  After the appraisal, Commonwealth tendered to Trident $567,000, stating that the LLOLE limited Trident's recovery to the amount stated in the SOV that exceeded $10 million.

### III. ANALYSIS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

## A.     Evidentiary Analysis

In resolving a motion for summary judgment, the court may only consider admissible evidence.  *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).  At the summary judgment stage, a court focuses on the admissibility of the evidence's content, not on the admissibility of the evidence's form.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  Trident has submitted an expert report by Ms. Grassia who claims to be an expert on "the custom and practice of the insurance industry, especially as it pertains to the underwriting and binding of insurance policies."  Dkt. # 106 (Grassia Decl.) ¶ 1. Ms. Grassia's report purports to provide expert testimony on the meaning of certain provisions in the insurance policy, the effect of certain preprinted words according to the custom and practice of the insurance industry, and notice requirements by law as well as the custom and practice of the industry.  Ms. Grassia also provides legal conclusions.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)  the testimony is based on sufficient facts or data;
(c)  the testimony is the product of reliable principles and methods; and
(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011).[6]  An opinion is not objectionable just because it embraces an ultimate issue.  Fed. R. Evid. 704.  Nevertheless, an expert cannot give an opinion as to her legal conclusion, and instructing the jury as to the applicable law is the distinct and exclusive province of the court.  *Nationwide Transport Finance v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).  Interpretation of insurance policies is also a question of law reserved for the court.  *Weyerhaueser Co. v. Aetna Cas. & Sur. Co.*, 123 Wash. 2d 891, 897, 874 P.2d 142 (1994).

Accordingly, the court has not considered the portions of Ms. Grassia's report that provide her interpretation of the meaning of the policy language, legal conclusions or purport to advise the court of applicable laws.  The court notes that Ms. Grassia seems to be unaware that the notice requirements of RCW 48.18.290 and RCW 48.18.2901 are inapplicable to surplus line coverage, which is the type of insurance secured here.  *Saunders v. Lloyd's of London*, 113 Wash. 2d 330, 333 n.1, 779 P.2d 249, 251 (1989).  Nevertheless, her testimony about the custom and practice of the industry regarding other notice requirements is admissible, including (1) sending notice of material changes upon renewal in advance of the policy issuance, (2) delivering policies within a reasonable time after binding, typically between 30 and 90 days, and (3) providing copies of a new

---

[6] The changes to Rule 702 are intended to be stylistic only.  *Id.,* Advisory Comm. Notes, 2011 Amendments.

form or endorsement the insurer intends to add to a renewal policy in coverage quotes and explaining and/or highlighting material policy changes.

**B.      Notice of LLOLE**

Commonwealth argues that Trident received notice of the LLOLE and clause 45 because Commonwealth sent Wells Fargo a quote for the 2007-2008 renewal on December 17, 2007, Trident agreed to accept the quote and requested the binder, and the broker requested that Commonwealth bind coverage for the term effective 12/31/2007 to 12/31/2008.  Dkt. # 89 (Def.'s Mot.) at 14-15.

Trident has provided expert testimony on the custom and practice regarding certain notice requirements in the insurance industry.  Ms. Grassia states that it is the custom and practice in the insurance industry to provide the insured and the broker with notice of material changes in a renewal policy.  Dkt. # 106 at 9 (Grassia Report ¶ 15). She also states that it is the custom and practice in the insurance industry to provide copies of new forms and endorsements the insurer intends to add to a renewal policy in coverage quotes, as well as calling attention to the endorsements by highlighting or explaining what the endorsement entails.  *Id.* at 10 (¶ 17).  She also states that it is the custom and practice in the insurance industry that insurance policies are delivered to insureds within a reasonable time after binding, preferably within 30 to 90 days.  *Id.* at 11 (¶ 20).

Commonwealth does not dispute that it did not attach the LLOLE to the coverage quote or binder.  Commonwealth does not dispute that it did not highlight or explain the change in the coverage quote or binder.  Commonwealth does not dispute that it sent the LLOLE to Wells Fargo for the first time in June 2008, more than six months after binding.  Commonwealth does not dispute that Trident received the LLOLE for the first

time on July 18, 2008, the Friday before the fire.[7]  Commonwealth does not dispute that

during the course of its fifteen year relationship, Commonwealth had previously provided

the language of new endorsements or policy changes in renewal policies with the quote

and/or binder.  Faced with these facts, the court finds that a reasonable jury could find

that Trident did not receive notice of the LLOLE, rendering it unenforceable.  *See*

*McGreevy v. Or. Mut. Ins. Co.*, 74 Wash. App. 858, 867-68, 876 P.2d 463, 469 (1994)

("Notice and agreement must be obtained before amendments or modifications to

insurance policies can be made by the insurer."; "Without receipt of the actual

endorsement . . . the notation would not have been meaningful.").

Commonwealth argues that Trident "had a duty to read and understand the offer

(i.e., the quote for insurance) before agreeing to it."  Dkt. # 111 (Def.'s Reply) at 6; # 89

(Def.'s Mot.) at 18.  The court does not understand how Trident could have read and

understood the LLOLE when it was not provided to Trident until July 18, 2008, just days

before the fire.  Commonwealth also argues that Wells Fargo received the policy on June

12, 2008, and that Trident should be bound by its agent's knowledge and that it should

not be penalized for her failure to review the policy and send it to Trident until July 18.

Dkt. # 89 (Def.'s Mot.) at 15-18; # 111 (Def.'s Reply) at 6-7.  Under Washington law,

"one securing insurance for another becomes an agent for that person."  *Orsi v. Aetna Ins.*

*Co.*, 41 Wash. App. 233, 239, 703 P.2d 1053, 1057 (1985).  However, Washington law

does not automatically impute the knowledge of an insurance broker to the insured for

purposes of mutual assent to material changes in a renewal policy, and the court is

---

[7] During oral argument, Trident referred the court to a February 27, 2008 email from Wells Fargo to Commonwealth, which seems to suggest that Commonwealth was aware that Wells Fargo was not aware of the LLOLE.  That document was not provided to the court in support of the summary judgment motions at issue here, but may be found in the record at Dkt. # 127-6 at 4.  The court need not rely on this document in concluding that a reasonable jury could find that Trident did not receive notice of the LLOLE.

unpersuaded by cases in other jurisdictions holding otherwise.[8] Rather, one securing insurance for another becomes an agent with only such authority as is conferred upon him by the insured. *Id.* The question of an agency relationship is one of fact unless no facts are in dispute and the facts are susceptible of only one interpretation. *Id.*

During oral argument, Commonwealth cited the client services agreement between Wells Fargo and Trident as evidence of the agency relationship. Pursuant to the client services agreement, Wells Fargo agreed to provide the following insurance brokerage services, among others: review potential additional coverages and make suggestions; review all insurance policies and delivery in a consolidated format; and timely execution of all change requests and delivery of resulting endorsements. Dkt. # 171-19 at 2 (Ex. 19 to 2d Houser Decl.). However, this client services agreement does not automatically impute knowledge of an undisclosed endorsement, or provide Wells Fargo the authority to accept material changes in a renewal policy that were not provided to it. The facts here, when viewed in the light most favorable to the non-moving party, are not susceptible to only one interpretation.[9] Even if the court imputed Wells Fargo's knowledge of the LLOLE when she reviewed it on July 16, 2008 (Dkt. # 109-9 at 17 (Ex.

---

[8] During oral argument, Commonwealth cited *Puget Sound Nat'l Bank v. St. Paul Fire and Marine Ins.*, 32 Wash. App. 32, 645 P.2d 1122 (1982) for the proposition that generally, knowledge of an agent is imputed to its principal. That court acknowledged the general rule that "a principal is chargeable with notice of facts which are within the knowledge of his agent, acquired within the scope of the agent's authority." *Id.* at 40. The court also acknowledged a well recognized exception that where the agent acquires information that would be to his advantage to conceal from his principal, there is no imputation of knowledge. *Id.* The court also noted that the exception is qualified by the rule that, if the agent is the sole representative of the principal, or the only person or means by which the principal acts, then the knowledge of the agent will be imputed to the principal, and the general rule applies. *Id.* The exception is inapplicable here, and *Orsi* conforms with this the general rule.

[9] The court notes that even if the court considered the eleventh hour submission of the Rider Declaration and Misenti Deposition, it would find that a disputed issue of material fact exists with respect to whether Trident's broker had authority to bind coverage on a policy that contained the LLOLE.

JJ to Schuknecht Decl., Fauber Depo. at 42:1-25), a reasonable jury could still find that notice was inadequate, rendering the LLOLE unenforceable.[10]

## C.    Policy Interpretation

In Washington, insurance policy interpretation is a legal question. *Overton v. Consol. Ins. Co.*, 145 Wash. 2d 417, 424, 38 P.3d 322, 325 (2002).  A court considers an insurance policy as a whole, and gives it a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wash. 2d 165, 171, 110 P.3d 733, 737 (2005) (internal quotations omitted).  If the policy language is clear and unambiguous, it must be enforced as written.  *Id.*  A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.  *Id.*  If a clause is ambiguous, the court may rely on extrinsic evidence of the parties' intent to resolve the ambiguity.  *Id.* at 171-72.  After examination of the applicable extrinsic evidence, any ambiguity is resolved against the insurer and in favor of the insured.  *Id.* at 172.  While exclusions should be strictly construed against the drafter, a strict application should not trump the plain, clear language of an exclusion such that a strained or forced construction results. *Id.*  Additionally, the expectations of the insured cannot override the plain language of the contract.  *Id.*

The LLOLE provides:

The premium for this Policy is based upon the Statement of Values provided.  In the event of loss under the policy, the liability of the Company shall be limited to the least of the following:

---

[10] Although not before the court at this time, the court notes that the quote and binder for the 2006 policy, which was effective August 31, 2006, also did not include copies of the limit of liability endorsement (or any other explanation of the change) that appeared for the first time in that policy.  Commonwealth does not dispute that Trident received that limit of liability endorsement for the first time in June 2007, more than 10 months after the effective date of the policy.

i)    The amount of the loss;

ii)   100% of the total stated value for each category insured, for which a claim has been presented, including, building, contents, machinery and equipment, Stock, business income or Gross Earnings, Extra Expense and any other coverage provided at such Location, as shown on the latest Statement of Values or other documentation on file with the Company;

iii)  The Limit of Liability, any Sublimit of Insurance or Amount of Insurance specifically used in this Policy that applies to any insured loss or coverage or Location.

Dkt. # 91-3 at 77 (Ex. 4 to Houser Decl.).

1.   <u>Does the LLOLE limit Commonwealth's liability to $567,000?</u>

Trident argues the language in the LLOLE "does not expressly (or unambiguously) allow Commonwealth to offset its obligation to Trident by subtracting its underlying insurers' loss payments from the Chignik value shown on Trident's SOV, and to thereby limit its exposure to $567,000." Dkt. # 110 (Pl.'s Opp'n) at 17; Dkt. #138 (Pl.'s Mot.) at 18 (arguing that Commonwealth's liability necessarily exceeds $567,000). Commonwealth argues that the policy must be read as a whole and the policy limit read in conjunction with the LLOLE limits its liability to $567,000. The policy provides:

The Company shall not be liable under this Insurance for more than Ten Million dollars part of Ten Million dollars ($10,000,000 part of $10,000,000) any one loss occurrence, from insured perils, in excess of the primary and underlying insurance and shall only be liable to pay after the primary and underlying insurers have paid or have been held liable to pay Ten Million dollars ($10,000,000) any one loss occurrence from insured perils[.]"

Dkt. # 91-3 at 74 (Ex. 4 to Houser Decl.).

However, nothing in the LLOLE indicates that the amount provided in the SOV will be offset by the primary and first layer payments. Nor does the total policy limit of $10 million quoted above reference the SOV. The LLOLE could be reasonably interpreted to mean both that it limits Commonwealth's layer only and that it limits all

layers. Accordingly, the court looks to extrinsic evidence to aid in interpretation. *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wash. 2d 678, 684, 871 P.2d 146, 149 (1994). In evaluating the insurer's claim as to the meaning of language used, courts necessarily consider whether alternative or more precise language, if used, would have put the matter beyond reasonable question. *Id.* at 688. Commonwealth's underwriter testified that the LLOLE language was changed in 2006 as a result of the *Core-Mark* case. Dkt. # 109-2 at 16 (Ex. D to Schuknecht Decl., Myland Depo. at 91:6-22). The limit of liability endorsement in the *Core-Mark* case ("2006 endorsement") limited Commonwealth's liability to the least of: (a) the actual adjusted amount of loss; (b) the "total stated value for the property involved, as shown on the latest statement of values on file with the company plus 10%, **less applicable deductible(s) and/or underlyer(s)**[;]" or (c) the limit of liability or amount shown on the face of the policy. *Core-Mark Int'l Corp. v. Commonwealth Ins. Co.*, Case No. 05-183 WHP, 2006 WL 2501884, *2 (S.D.N.Y. 2006) (emphasis added). The 2006 endorsement explicitly provided an offset of the amount provided in the statement of values by the primary and first layer payments. The fact that the language "less applicable deductible(s) and/or underlyer(s)" was removed from the 2006 endorsement and no other offset language appears in the LLOLE supports Trident's interpretation of the LLOLE. *See Quadrant Corp.*, 154 Wash. 2d at 172 (ambiguity is resolved against the insurer and in favor of the insured).

The court finds that the LLOLE does not allow Commonwealth to offset its obligation by subtracting the underlying insurance payments from the amount stated in the SOV. Accordingly, the LLOLE does not limit Commonwealth's liability to $567,000.

2.    Does the LLOLE limit liability by category and location?

With respect to subsection (ii) of the LLOLE, the court has been unable to locate a case that interprets an insurance policy with this exact language. Commonwealth argues

that the plain language of the LLOLE limits the amount of loss to the value declared "for each category insured . . . at such Location, as shown on the latest Statement of Values[.]" Dkt. # 89 (Def.'s Mot.) at 7 (quoting LLOLE). Commonwealth's interpretation would limit the loss by location as well as by each category. In contrast, Trident argues that the LLOLE only limits liability by "'each category insured, for which a claim was presented,' *not* by location." Dkt. # 110 (Pl.'s Opp'n) at 20 (emphasis in original). Trident's interpretation would only limit liability by various categories, such as building, equipment, etc.

Commonwealth's liability under subsection (iii) of the LLOLE is limited to $10 million, the total amount of the policy limit. Under Trident's interpretation, the limit under subsection (ii) would exceed $190 million. Dkt. # 109-3 at 11; # 109-4 at 5 (Exs. H, L to Schuknecht Decl.) (building value: $192,604,859 million).[11] However, because Commonwealth's liability cannot exceed the policy limit, Trident's interpretation under subsection (ii) would also limit liability to $10 million. An interpretation of a contract that gives effect to all of its provisions is favored over one which renders some of the language meaningless or ineffective. *Wagner v. Wagner*, 95 Wash. 2d 94, 101, 621 P.2d 1279 (1980); *see Allstate Ins. Co. v. Huston*, 123 Wash. App. 530, 541-42 (2004) (rejecting interpretation that would render a clause in the insurance policy superfluous). Trident's interpretation would render one of these subsections superfluous. Accordingly, plaintiff has failed to put forth a reasonable interpretation of the LLOLE. The plain language of subsection (ii) is not ambiguous. The phrase "at such Location" modifies and limits the categories that are included in "each category." Dkt. # 91-3 at 77 (Ex. 4 to Houser Decl.) ("100% of the total stated value for **each category** insured, for which a

---

[11] It is unclear to the court whether "BPP" and "(Rents) BI + EE" are covered categories. The court also notes that "computer equipment" was valued at $2,652,000. However, for purposes of this order, the court need not determine the total stated values for each covered category.

claim has been presented, **including,** building, contents, machinery and equipment, Stock, business income or Gross Earnings, Extra Expense **and any other coverage provided at such Location**, as shown on the latest Statement of Values or other documentation on file with the Company.") (emphasis added).

Accordingly, the court finds that the plain language of the LLOLE limits liability by category and location.

3.   Is the E&O clause limited to errors and omissions identified and corrected before a loss has occurred?

The E&O clause provides:

Any unintentional error or omission made by the Insured shall not void or impair the insurance hereunder provided the insured reports such error or omission as soon as reasonably possible after discovery and pays appropriate premium thereon.

Dkt. # 91-3 at 17 (Ex. 2 to Houser Decl., Lexington Policy ¶ 24); Dkt. # 139-4 at 21 (Ex. P to 2d Schuknecht Decl.).

Trident argues that the E&O clause is not limited to errors and omissions discovered pre-loss. Dkt. # 138 (Pl.'s Mot.) at 20. Commonwealth argues that public policy prohibits claimants to purchase insurance after a loss and Trident failed to report any error or omission as soon as reasonably possible after discovery. Dkt. # 169 (Def.'s Opp'n) at 21. During oral argument, Commonwealth argued that the relevant public policy the court should consider is the principle of fortuity, or the known risk principle. "The known risk defense is premised on the principle that an insured cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased." *Aluminum Co. of Am. v. Aetna Cas. & Surety Co.*, 140 Wash. 2d 517, 556, 998 P.2d 856 (2000). However, during oral argument, Commonwealth conceded that there was no claim for a loss that Trident subjectively knew would occur when it purchased the insurance. The fortuity principle is inapplicable here.

1    Commonwealth also argues that "case law around the country is unanimous that

2  an Errors and Omissions provision does not apply post-loss." *Id.* (citing *Simon v. Nat'l*

3  *Union Fire Ins. Co. of Pittsburgh,* 782 N.E. 2d 1125, 1128 (Mass. App. Ct. 2003),

4  *Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.*, 419 F.3d 310, 317 (5th

5  Cir. 2005), and *Titan Indem. Co. v. Hall Co.*, 413 S.E.2d 213, 214 (Ga. Ct. App. 1992)).

6  The court has reviewed these cases and the Ninth Circuit case cited by Commonwealth,[12]

7  and finds them unpersuasive.  In *Simon*, the court determined that the property was not

8  covered under the insurance policy and concluded that the E&O clause "does not permit

9  an insured to obtain insurance coverage for an uncovered loss that has already occurred."

10  57 Mass. App. Ct. at 354.  In *Wentwood Woodside*, the court emphasized that the

11  undisputed facts of the case establish that plaintiff "simply never purchased excess flood

12  insurance[.]"  419 F.3d at 316.  The court then concluded that the E&O clause was

13  inapplicable because it "applies only to insured risks."  *Id.*  In *Port of Olympia*, the court

14  found significant that the insured expressly declined to pay the premium on the subject

15  property and instructed the insurer to remove the property from the policy.  73 Fed.

16  Appx. at 951.  The court concluded that "[c]overage does not extend in such

17  circumstances."  *Id.*  The court rejected the insured's argument to invoke the E&O clause,

18  reasoning that the insured's argument "encourages the insured to 'insure' its properties by

19  waiting until a particular building suffers a loss and then pay the premium on that

20  property only, thus saving the cost of insuring all its properties."  *Id.*

21    The last case cited by Commonwealth also does not persuade the court.  In *Titan*

22  *Indemnity Co.*, the question before the court was whether the trial court erred in

23  concluding that the unintentional errors endorsement was applicable to the insured's duty

24  under the contract to provide prompt notice of an occurrence which may result in a claim.

25  _____

26    [12] Commonwealth failed to provide a citation to the *Port of Olympia v. Lexington Ins. Co.*
   case.  Nevertheless, the court has located it and notes that it is an unpublished decision applying
27  Washington law.  73 Fed. Appx. 949 (9th Cir. 2003).

202 Ga. App. at 39.  The court concluded that the trial court erred because the language of the endorsement as a whole did not deal with the insured's obligation to report potential claims.  *Id.*  Rather, the errors endorsement dealt with "the reporting of information relevant to the insurer's assessment of the risk involved in extending coverage."  *Id.*  The court concluded that a failure to provide notice of an accident covered by the policy would not affect the premium due.  *Id.* (quoting language in endorsement:  "[h]owever, we are entitled to premium based upon the correct information[.]").

      *Simon*, *Wentwood Woodside*, and *Port of Olympia* each involve attempts by the insured to cover losses where no coverage existed.  For that reason, these cases are distinguishable.  There is no dispute that there is coverage for the loss sustained at the Chignik plant.  The dispute is as to Commonwealth's liability for the amount of the loss.  The issue in *Titan Indemnity* is irrelevant here.  The cases cited by Commonwealth do not support its conclusion that as a matter of law the E&O clause only applies post-loss.  Rather, the plain, unambiguous language of the policy provides no limitation on time as to when an insured may invoke it.  The court will not impute such a limitation into a clear and unambiguous provision.[13]

**D.**    **Equitable Estoppel (Second Affirmative Defense)**

      The elements of equitable estoppel are:  (1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from

---

[13] There are three conditions under the E&O clause:  (1) the misstatement was unintentional, (2) the insured must report the error reasonably promptly, and (3) pay the additional premium.  Commonwealth does not dispute the first condition, but argues that Trident unreasonably delayed in invoking the E&O clause by waiting three years to raise it.  However, this argument is irrelevant to the court's interpretation of the E&O clause, and neither party has moved the court for an order determining whether the E&O clause has been established as a matter of law.  *See* Dkt. # 89 & # 138.

allowing the first party to contradict or repudiate such admission, statement, or act. *Dombrosky v. Farmers Ins. Co. of Wash.*, 84 Wash. App. 245, 256, 928 P.2d 1127, 1134 (1996). "Because equitable estoppel is not a favored doctrine, the party asserting estoppel must prove each of its elements by clear, cogent, and convincing evidence, that is, by evidence of sufficient persuasive impact as to cause the trier of fact to believe that the fact at issue is highly probable." *Id.*

Commonwealth argues that, regardless of the LLOLE, Trident is estopped from claiming an amount in excess of the amount declared for the Chignik Plant in the SOV. Dkt. # 89 (Def.'s Mot.) at 19-22. In its motion seeking dismissal of this affirmative defense, Trident argues that Commonwealth cannot prove that "Trident represented in its SOV that the maximum Chignik replacement value was $10,567,000, and that Commonwealth relied on that figure to its detriment." Dkt. # 138 (Pl.'s Mot.) at 17. Commonwealth argues that it relied on Trident's assurance that the values in the SOV were "true and correct." Dkt. # 89 (Def.'s Mot.) at 20. However, no representative of Trident signed and dated the SOV attesting that the values were true and correct. Dkt. # 109-3 at 11, 109-4 at 6 (Exs. H, L to Schuknecht Decl.). Indeed, Commonwealth's underwriter testified that Commonwealth did not require Trident to verify by signature the statement of values after the LOLLE was attached. Dkt. # 109-2 at 27-28 (Ex. D to Schuknecht Decl., Myland Depo. at 153:24-154:14). On the other hand, whether signed or not, Trident created the form and submitted it to Commonwealth. Commonwealth's underwriter has also stated that she never would have bound coverage had she known Trident's properties were worth more than twice the value represented. Dkt. # 90 ¶ 3 (Myland Decl.). She also testified in her deposition that she used a formula of $0.03 per $100 to determine the premium. Dkt. #109-2 at 14 (Myland Depo. at 87:2-7).[14] These

---

[14] The court notes that Ms. Myland has made at least some seemingly inconsistent statements in her declaration and deposition. *Compare* Dkt. # 90 ¶¶ 3, 5 (Myland Decl.) *with*

statements are not inherently contradictory, and it is not the court's role to assess the credibility of a witness on summary judgment. These, as well as other factual disputes raised by the parties, are determinations that must be made by a jury.[15] *Litz v. Pierce County*, 44 Wash. App. 674, 683, 723 P.2d 475 (1986) (estoppel analysis generally involves issues of fact).

Accordingly, the court DENIES summary judgment on the estoppel affirmative defense for both parties.

## E. Unclean Hands (Third Affirmative Defense)

A court of equity will not intervene on behalf of a party whose conduct has been unconscientious, unjust, or marked by a lack of good faith. *King County v. Taxpayers of King County*, 133 Wash. 2d 584, 644, 949 P.2d 1260, 1290 (1997). The clean hands doctrine only precludes a party from obtaining equitable relief if the party has committed willful misconduct that has an immediate and necessary relation to the requested relief. *J.L. Cooper & Co. v. Anchor Sec. Co.*, 9 Wash. 2d 45, 73, 113 P.2d 845 (1941).

Commonwealth provides two potential instances of unclean hands: (1) Trident's undervaluing the properties on the SOV and (2) Trident's purported conduct that caused delay during the claims adjustment process.[16] Dkt. # 169 (Def.'s Opp'n) at 14-17.

---

Dkt. # 109-2 at 13-15, 28, 31 (Ex. D. to Schuknecht Decl., Myland Depo. at 86:25-88:20, 154:2-15, 207:11-24).

[15] *See e.g.*, Dkt. # 109-3 at 8, 11 (Ex. H to Schuknecht Decl.) ("RC" entered for Chignik plant, but "ACV" entered for Petersburg plant); Dkt. #139-1 at 3 (Ex. A to 2d Schuknecht Decl., Murray Depo. at 311:6-17) (statements of value were based on acquisition cost, not replacement cost); *Id.* at 12 (Murray Depo. at 375:23-10) (no Commonwealth documents that provide guidance on how to calculate statement of values); Dkt. # 171-5 at 4 (Ex. 5 to 2d Houser Decl., Misenti EUO at 32:16-33:4) (statement of values are created by purchase price taking into consideration capital improvements and general market value); Dkt. # 184-2 at 45 (Ex. CC to Supp. Schuknecht Decl., Myland Depo. at 203:7-204:10) (Lexington policy arguably inconsistent with designations of RCV or ACV on statement of values).

[16] Trident argues that Commonwealth should not be able to use Trident's conduct during the claims adjustment process as a basis for its unclean hands defense when it never previously raised it. Dkt. # 182 (Pl.'s Reply) at 8. The issue of waiver of affirmative defenses has not been fully briefed for the court, and the court declines to rule on waiver at this time. The court notes

During oral argument, Commonwealth conceded that (1) there is no evidence of intentional misconduct by Trident, and (2) Trident's delay during the claims adjustment process is not related to Trident's equitable claims. Commonwealth's evidence of Trident's delay in the claims adjustment process would still be related to Trident's claims of bad faith, violation of the Consumer Protection Act, and violation of the Insurance Fair Conduct Act. However, these are not equitable claims.

Accordingly, the court GRANTS Trident's motion for summary judgment regarding Commonwealth's unclean hands affirmative defense.

**F.  Comparative Fault and Failure to Mitigate (Fourth and Sixth Affirmative Defenses)**

RCW 4.22.070 allows a trier of fact to determine the percentage of total fault in actions involving fault of more than one entity. RCW 4.22.070. "Fault" is limited to conduct that is negligent, reckless, or that subjects the actor to strict liability. RCW 4.22.015; *Tegman v. Accident & Med. Investigations, Inc.*, 150 Wash. 2d 102,111, 75 P.3d 497, 501 (2003). "Fault" also includes an "unreasonable failure to avoid an injury or to mitigate damages." RCW 4.22.015.

The only conduct Commonwealth complains of is Trident's conduct during the claims adjustment process.[17] Dkt. # 169 (Def.'s Opp'n) at 9. The court finds that Trident's conduct complained of during the claims adjustment process does not rise to negligence, recklessness, or subject Trident to strict liability as a matter of law. Accordingly, the only basis for Commonwealth's comparative fault defense is Trident's purported unreasonable failure to mitigate damages.

"The doctrine of avoidable consequences, or mitigation of damages, prevents an injured party from recovering damages that the party could have avoided through

---

that Commonwealth's answer to Trident's Second Amended Complaint does not include affirmative defenses or counterclaim, as indicated by the caption. Dkt. # 192, # 193.

[17] Commonwealth concedes that it does not assert a reverse bad faith affirmative defense.

reasonable efforts." *Jaeger v. Cleaver Const., Inc.*, 148 Wash. App. 698, 714, 201 P.3d 1028, 1037 (2009). "Courts allow a wide latitude of discretion to the person who, by another's wrong, has been forced into a predicament where he is faced with a probability of injury or loss." *Id.* at 715. "If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that the injured party chose one over the other." *Id.* Additionally, a plaintiff has no duty to mitigate when the defendant has equal opportunity to do so. *Walker v. TransAm. Title Ins. Co., Inc.*, 65 Wash. App. 399, 405-06, 828 P.2d 621, 625 (1992).

Commonwealth argues that Trident failed to mitigate its damages by (1) filing a premature lawsuit to the extent Trident seeks attorney's fees as damages under Consumer Protection Act or the Insurance Fair Conduct Act; (2) failing to pursue damages against Wells Fargo for violating duties as a broker; and (3) failing to pursue a claim against Trident's third-layer excess insurer and to use money available to it to begin the process of rebuilding. Dkt. # 169 at 10-11.

With regard to the latter two, the court agrees with Trident. First, a plaintiff has the right to decide whom to sue. Additionally, whether or not Wells Fargo committed malpractice is irrelevant to whether Trident is entitled to the policy limits. Second, Trident's third-layer excess insurer only attaches after the underlying excess insurers paid or admitted liability for the full amount of their respective policies. Dkt. # 139-2 at 4 (Ex. E to 2d Schuknecht Decl., Lloyd's of London Policy, p. 3 ¶ 3 Limit). In addition, an insured is not required to tender claims to every potential liable insurer. *See Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wash. 2d 411, 421, 191 P.3d 866 (2008). Either Trident was entitled to the excess $10 million policy limit (or some portion thereof) or it was not.

Trident has failed to address Commonwealth's argument regarding attorney's fees relating to motions practice for appraisal and discovery. However, Trident argues that its attempt to collect the policy limit is an action for an unpaid debt, which is not subject to

failure to mitigate defenses.  Dkt. # 138 (Pl.'s Mot.) at 15.  Trident is mistaken.  The case cited by Trident, *Metro. Mtg. & Secs. Co. v. Becker*, 64 Wn. App. 626, 631, 825 P.2d 360 (1992), is not a lawsuit by an insured against the insurer for damages.  Trident has not cited, and the court is unaware of, any legal authority that has found that an insured's claim against its insurer is an action in unpaid debt, rather than damages.  Trident also argues that the doctrines of mitigation and avoidable consequences do not apply where a plaintiff has a choice of two reasonable courses or where defendant has an equal opportunity to perform acts of mitigation.  Dkt. # 138 at 16.

Commonwealth has presented evidence that, when viewed in the light most favorable to Commonwealth, does not allow the court to rule as a matter of law that Trident's decision to file suit before completion of the claims adjustment process or appraisal was reasonable.  *See* Dkt. # 171 (Exs. 9, 10, 18, 22, 26-29, 31, 33, 35, 39-42 to 2d Houser Decl.).

Accordingly, the court GRANTS Trident's motion for partial summary judgment regarding Commonwealth's Comparative Fault and Failure to Mitigate affirmative defenses with respect to Trident's failure to file a malpractice claim against Wells Fargo or failure to file an insurance claim with its third-layer excess insurer.  The court DENIES Trident's motion with respect to mitigation of attorney's fees.

**G.    Treble Damages (Seventh Affirmative Defense)**

Commonwealth argues that an award of punitive damages must comport with constitutional limitations, which generally require a degree of reprehensibility beyond simply "unreasonable" behavior.  Dkt. # 169 at 18-21.  Commonwealth concludes that the imposition of treble damages for violation of the Insurance Fair Conduct Act is punitive damages, and must comport with constitutional requirements of reprehensibility.

The cases cited by Commonwealth do not address statutory damage multipliers.  The court is unaware of any cases that have found that the imposition of statutory treble

damages for unreasonable conduct is, or even may be, unconstitutional.  Additionally, the legal authority cited by Commonwealth seems to suggest that a single digit multiplier would be constitutional.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 410 (2003) ("Single-digit multipliers are more likely to comport with due process . . . .").  Nevertheless, the court believes that to the extent treble damages are appropriate, it would be with respect to the upper limits of unreasonable conduct, rather than mere technical violations.  Commonwealth is entitled to present this defense.

Accordingly, the court DENIES Trident's motion with respect to Commonwealth's seventh affirmative defense.

## IV. CONCLUSION

For all the foregoing reasons, the court DENIES Commonwealth's motion for partial summary judgment on Trident's breach of contract claim.  Dkt. # 89.  The court GRANTS in part and DENIES in part Trident's motion for partial summary judgment and DISMISSES Commonwealth's Third Affirmative Defense of unclean hands.  Dkt. # 138.


Dated this 7th day of February, 2012.


The Honorable Richard A. Jones
United States District Judge